FIRST NATIONAL BANK OF ANN ARBOR *v.* HOLMES.

1. Appeal and Error—Statement of Errors Relied Upon—Briefs
   of Appellants—Supreme Court Rules.
   The brief of appellant should conform to Supreme Court
   Rule No. 40, stating the errors relied upon, the questions
   involved, and the manner in which they are raised.

2. Evidence—Parol Evidence—Written Contracts.
   Parol evidence is inadmissible to vary or contradict a con-
   temporaneous written contract.

3. Same—Bills and Notes—Parol Evidence—Consideration.
   In an action upon a promissory note, which is absolute upon
   its face, no evidence of a verbal agreement made at the
   same time, qualifying its terms, is admissible, but the cir-
   cumstances under which it was given may be inquired into
   as bearing upon the consideration.

4. Trial—Bills and Notes—Consideration—Evidence—Question
   for Jury.
   Conflicting evidence as to the circumstances under which
   the note sued upon was given, bearing upon the consid-
   eration, *held*, to present a question of fact for the jury.

5. Principal and Agent—Authority of Agent—Question for
   Jury.
   Where one of the defendants and another had authority to
   negotiate a loan with a bank for a corporation in which
   they were interested, as to whether they had authority to
   dispose of the proceeds of the same, *held*, properly sub-
   mitted to the jury.

6. Same—Apparent Authority of Agent.
   The apparent authority of an agent to act as the representa-
   tive of his principal is to be gathered from all the facts
   and circumstances, and, ordinarily, this is a question of
   fact for the jury.

7. Contracts—Bills and Notes—Consideration.
   Where $2,000 of the proceeds of a loan negotiated with a
   bank for a corporation was applied to the payment of the
   private debt to the bank of one authorized with defend-

ant to make the loan, he substituting $2,000 worth of stock of the corporation for the cash, and defendants, with notice thereof, signed the note sued on for that amount, in order to make up the amount necessary to carry through the transaction for which the loan was negotiated, the parties interested refusing to accept the stock in place of the money, it cannot be said that there was no consideration for the same moving to the defendants, although they protested against said action.

8. SAME—ELECTION OF REMEDY—ESTOPPEL.

That plaintiff bank filed a bill against defendants' associate to compel the return to it of the $2,000 and collateral security delivered to him, which bill was dismissed, *held*, not to estop plaintiff from maintaining the present action on the note.

9. APPEAL AND ERROR—EVIDENCE—ADMISSIBILITY—MISCARRIAGE OF JUSTICE.

While evidence complained of was remote, if it cannot be said that its admission was prejudicial, or that it resulted in a miscarriage of justice under 3 Comp. Laws 1915, § 14565, the case will not be reversed therefor.

10. NEW TRIAL—WEIGHT OF EVIDENCE.

Motion for new trial on the grounds that the verdict was against the clear weight of the evidence, and against the charge of the court, *held*, properly denied.

Error to Washtenaw; Sample (George W.), J. Submitted October 13, 1920. (Docket No. 62.) Decided February 3, 1921. Rehearing denied March 31, 1921.

Assumpsit by the First National Bank of Ann Arbor against Harmon S. Holmes and another on a promissory note. Judgment for plaintiff. Defendants bring error. Affirmed.

*Frank E. Jones* (*A. A. Ellis,* of counsel), for appellants.

*Cavanaugh & Burke* and *Arthur Brown* (*E. R. Sunderland,* of counsel), for appellee.

STONE, J. This case has been brought to this court

by the defendants on writ of error to review a judgment in the court below, for the plaintiff upon a promissory note made by the defendants, in the words and figures following:

"$2,290.00          Ann Arbor, Mich. Aug. 25, 1917.

"One year after date I promise to pay to the order of the First National Bank of Ann Arbor twenty-two hundred and ninety dollars, at the First National Bank of Ann Arbor. Value received with interest at six per cent. after date, payable semi-annually.

"A. F. Freeman,
"H. S. Holmes."

There are 63 assignments of error. The original brief of counsel for appellants is subject to the criticism that it does not contain a statement of the errors relied upon, the questions involved and the manner in which they are raised. Supreme Court Rule No. 40; *Mason* v. *Partrick*, 100 Mich. 577; *Hunter* v. *Township of Dwight*, 157 Mich. 634. As said by Justice Hooker in the last-cited case:

"As we have often said, such omissions are productive of much inconvenience to the court, and are hazardous to the interest of appellant."

Counsel for appellants in their original brief say:

"It seems to us unnecessary, and really not in good taste, to consider or treat separately each of the many assignments of error; but we do not thereby mean to abandon any of such alleged errors, not a single one of them, for we regard them all legally well taken and sound; but, of course, we were required to assign the error to have the benefit of the exception.

"The exceptions taken and the errors assigned will fairly swing about a few general headings conveniently grouped, which also fairly embrace the mistakes made at the trial and the error for refusing to grant a new trial, and are all covered by the assignments in such respects."

This is not a compliance with either the letter or spirit of the rule. The language of this court in *Stowe* v. *Express Co.*, 179 Mich. 349, is applicable here,

but we have concluded to consider such propositions as are discussed by counsel and are raised by the assignments of error.

Under the plea of the general issue the defendants gave notice:

(1) That there was no consideration for this note.

(2) That it was signed and issued under conditions making it void as against public policy.

(3) Set-off of $2,000 which it is alleged the plaintiff had received for the use and benefit of these defendants.

What appellants really claim under the notice of set-off is, that the $2,000 received for the original of the note in suit was money then and there legally belonging to them. That is only another way of saying that there was no consideration for the note, which is the first defense pleaded. So that there is no question of set-off as an independent inquiry involved in the case.

The case has been tried twice, before juries on these issues, and each time the plaintiff recovered for the full amount of its claim; the first verdict having been set aside, the case is now here to review a judgment entered upon the second verdict.

The evidence showed that the note in suit was the third renewal of an original note given by the two defendants on April 26, 1915, for $2,000 payable to the plaintiff in 10 days. About 20 days after the making of this original note, the first renewal note was made, payable to the plaintiff, on demand, for the same amount by the same makers, and was dated back to April 26, 1915, the date of the original note. In October, 1916, a second renewal note was made, also payable to the plaintiff on demand by the same makers, for the same amount, plus one year's interest, viz.: $2,120, and was dated April 26, 1916, one year after the making and delivery of the original note. In August, 1917, a third renewal note, the one in suit, was made and delivered by and to the same parties,

due one year after date, for the same amount plus accrued interest, viz.: $2,290, dated August 25, 1917. Certain letters claimed to have been written to plaintiff by defendant Freeman upon the occasion of the last two renewals will be referred to later. We agree with appellee's counsel that, as a renewal note, the note in suit would doubtless depend upon the original note for its validity, whether it were so specified or not, so that the circumstances surrounding the making of the original note become important.

We glean from the statement of facts the following circumstances surrounding the giving of the original note. Both of the defendants were prior to April 8, 1915, interested in a 4,000-acre tract of land in the Province of Alberta, Dominion of Canada, under an ordinary land contract to purchase from Leffingwell & Egan as vendors and land owners, residents of Alberta, defendant Freeman and George B. Rhead being the original contract purchasers, but assignment having been made in February, 1914, of said contract interest to said Rhead, by reason of the sickness of said Freeman, he still having an equitable interest therein. Defendant Holmes with others had also by assignment or otherwise become equitably interested in such contract which was dated June 15, 1913.

In the fall of 1914, by correspondence between Freeman and Leffingwell & Egan, and the other parties in interest, it was proposed to abandon the land contract terms, and incorporate the property involved, forming a Michigan corporation, whereby the parties so interested would take capital stock for an amount which their respective invested interest represented. With that end in view, Leffingwell visited Ann Arbor in December, 1914, and a conference was held by the interested parties and a tentative arrangement was made to incorporate under the name of The Michigan-Alberta Farming Company, with capital stock $100,-

000, and Leffingwell signed the articles as one of the incorporators, and with defendant Freeman and Rhead made affidavit as to the value of the property. At that meeting it was also arranged that the interest of Leffingwell & Egan was $60,000 as unpaid purchase price of the lands under the land contract, and they were to take as payment $30,000 in cash, and $30,000 par value of the capital stock of the corporation.

To finance the company and raise the $30,000 cash going to Leffingwell & Egan, it was at first suggested and attempted to negotiate two mortgages of $15,000 each upon the property, each mortgage to cover one-half of the land. It was arranged that defendant Freeman would attempt to place one of the proposed mortgage loans, and Rhead the other. Rhead reported to defendant Freeman that he had arranged with the plaintiff for his loan; later Freeman in conversation with Clarkson, the cashier of the plaintiff, asked: "What is the use if we could get that money all in one place of dividing that up into two?" Freeman's efforts to place the $15,000 mortgage having failed, the matter drifted along for a time.

A little later Clarkson informed defendant Freeman that Rhead had arranged with Leffingwell & Egan that they would take, when the corporation was perfected, and the stock issued, $5,000 of Rhead's stock in part payment to them of the $30,000 cash payment. Upon learning of this arrangement Freeman was dissatisfied and told Rhead that unless he would divide with him, so that he might furnish one-half of the stock thus going to Leffingwell & Egan, he would see that no corporation would be perfected. Later this matter was arranged by correspondence with Leffingwell & Egan to the end that it was agreed that they would also take $5,000 of Freeman's stock in the $30,000 cash payment, thus reducing the pre-arranged cash payment to $20,000. Finally the plan for the two $15,000 loans

was given up, and Freeman proposed to Clarkson to have the company, when perfected, make its three promissory notes of $10,000 each to one of its stockholders, and then also have the company execute its mortgage upon its lands to secure the stockholder payee of such notes, and thereupon such payee with five or six of the other stockholders were to indorse such notes, and then negotiate or discount them at a bank or banks, and thus obtain the $30,000 to satisfy the terms of the arrangement with Leffingwell & Egan. This plan met with approval. On April 8, 1915, the organization of the corporation was perfected, the capital stock being $100,000—there being 10,000 shares of the value of $10 each. The amount of capital stock subscribed was the sum of $81,790. The names of the stockholders and the number of shares subscribed for by each were as follows:

| | |
|---|---|
| Frank S. Leffingwell | 3,000 |
| George B. Rhead | 1,912 |
| Amariah F. Freeman | 1,912 |
| Egbert G. Hoag | 210 |
| Martin L. Belser | 210 |
| Frank Emory Chase | 105 |
| Harmon S. Holmes | 210 |
| Frank M. Stewart | 200 |
| Edward D. Kinne | 105 |
| Reuben Peterson | 210 |
| Joseph A. Goodyear | 105 |

The articles were signed by all of the above named parties, and by them acknowledged before S. W. Clarkson, notary public, and said articles were filed with the secretary of State on April 9, 1915. The stockholders took action on April 13, 1915, as follows:

"On motion duly made and carried, that this company does, by and through its proper officers, the president and secretary when elected, as provided by its by-laws, execute and deliver its certain three promissory notes of $10,000 each dated April 14, 1915, payable six months from date, with interest at 6 per cent.

to Harmon S. Holmes, as payee, who will indorse and negotiate the same, having also the signatures of certain others indorsed thereon, and with the moneys thus secured by such negotiations, the said president and secretary are authorized to pay the same to Leffingwell & Egan of Warner, Alberta, Canada, to liquidate and pay to them the certain obligation or debt owing by this company to them in the purchase of property and lands for the use and purpose of this company, and for which this company now has transfer therefor; and shall likewise execute and deliver the mortgage of this company upon all of its lands and real estate so, as aforesaid transferred to it in the province of Alberta, Canada, by said Leffingwell & Egan, to said Harmon S. Holmes, as trustee, to fully indemnify and secure all of the indorsers of said notes, by reason of his respective name thus indorsed, and as fully set forth in said trustee mortgage, and the declaration of trust of said Holmes, running in connection therewith."

On the same day, at a meeting of the directors of said company, the action of the stockholders aforesaid was adopted and approved. Defendant Freeman was elected president and Egbert G. Hoag, secretary. The notes and mortgage were executed, also a trust agreement by defendant Holmes, which latter instrument was acknowledged before S. W. Clarkson, notary public. The three $10,000 notes were made all bearing date April 14, 1915, due six months after date, payable to the order of Harmon S. Holmes, with interest at six per cent., after date, and were all indorsed by Harmon S. Holmes, A. F. Freeman, G. B. Rhead, E. G. Hoag, Reuben Peterson, and M. L. Belser.

The cashier, Clarkson, had told Rhead and Freeman that the plaintiff could not take the whole loan of $30,-000, but Freeman took the three notes to him with the understanding that Clarkson would attempt to negotiate two of them in Detroit and keep one of them for the plaintiff bank. Clarkson, cashier, went to Detroit and sold two of the notes to a bank there, and returned

with two checks for $10,000 each, the avails of two of the notes, one check payable to defendant Freeman and the other to George B. Rhead, and the plaintiff bank took the third note. It was the claim of defendants at the trial that Clarkson was not authorized to have said checks made payable to Freeman or Rhead, or to anybody other than defendant Holmes. However, they were indorsed respectively by Freeman and Rhead and turned over to the plaintiff.

We now come to the first real material conflict in the testimony, and that is as to what were the terms and conditions under which the plaintiff undertook to negotiate and purchase these notes, and under which it disposed of the avails. Rhead testified that he had originally made an arrangement with Leffingwell & Egan to turn over to them $7,000 of his stock in the company in place of that much cash, and he had so informed plaintiff's cashier when he and Freeman were at work on their scheme to float two $15,000 loans. The cash thus to be held back by Rhead was to be turned over to the plaintiff in payment of a debt of $7,000 which Rhead owed the bank. The plaintiff's cashier testified that the arrangement with Rhead was that, if the bank enabled Rhead and his associates to finance their land purchase, the whole of Rhead's debt of $7,000 was to be paid out of the avails of the loan, Rhead having assured him that he had an arrangement with Leffingwell & Egan to take $7,000 in stock in lieu of $7,000 in cash. Defendant Freeman, on the other hand, testified that Rhead and Clarkson told him that $5,000, and not $7,000, was to be sent by Rhead in stock in lieu of cash.

We compile from the testimony of Clarkson and defendant Freeman their claims as to what took place at the bank on April 21st and 26th. Clarkson testified in substance as follows in his direct-examination: That the money was procured from the bank in De-

213—Mich.—4.

troit, and from the plaintiff bank, as agreed, on the three notes. He went to Detroit and obtained two checks for $10,000 each, one payable to defendant Freeman and one to Rhead. They were indorsed respectively by them, and they asked for a draft payable to Leffingwell & Egan. When they came to the counter to get it, the statement was made by Rhead, or the witness, that there was $2,000 to come out; that Rhead had made arrangement for $2,000 more of his stock to be taken by Leffingwell & Egan, and a draft was finally issued for $18,000 and turned over to Freeman. Defendant Freeman stated that he did not know anything about the difference between the $18,000 and $20,000, and did not understand that. Witness told him that was the arrangement which the bank had with Rhead as the condition of making the loan and putting through the transaction, and that Rhead had assured the bank that he had the arrangement made, and the bank was to keep $2,000; that so far as the bank and the witness were concerned they had nothing whatever to do with the arrangements that were made, or were being made between the company and the men making up the company, and Leffingwell & Egan. Witness did not know that anything was said there, at that time, with regard to raising this additional $2,000; that Freeman accepted the draft under protest, saying he didn't understand there was any such agreement, and he didn't know that it would be accepted in that way. "That is all that was done that day." Witness stated to Freeman that that was the agreement with Rhead in regard to that matter. A day or two after Freeman came in and said he had a telegram from Leffingwell & Egan, and they said they had no such arrangement with Rhead, and they would need and must have $2,000 to send up there. Witness thought Holmes was not present at that time; that there was a lapse of several days and Freeman came

in again and said he would have to have the money. Witness said the bank had carried out its contract exactly as it had agreed, and if there was anything wrong he should settle that with Rhead; that finally one day he and Holmes came in (that was four or five days after the original arrangement), and said they had got to have that $2,000 to send to Leffingwell & Egan. Witness said:

"All right, gentlemen, you can get it any way you like, we have fulfilled our part of the contract, and I refuse to go any further with it; I will have nothing more to do with it; we have fulfilled our part as we agreed exactly between ourselves and Mr. Rhead."

Four or five days after that Freeman and Holmes said they must have that money to send to Leffingwell & Egan. Witness said: "The bank has fulfilled their part of the contract, you can do as you have a mind to"; that Holmes then said: "You have got our money, $2,000, we want to send it up there." Witness said:

"No, we have not, we did exactly as we agreed when we undertook the negotiation of this loan, the bank has done everything, Mr. Rhead has done as he agreed, if there is any more to be done it is between Holmes, Freeman and Rhead, the bank has done everything it agreed to in the whole matter."

Thereupon Holmes and Freeman went out of the bank. Soon after they came back with Judge Kinne (the president) and came into witness' office and had a talk with Judge Kinne that they had got to have this money, that they had got to send it up in order to close this contract, and that Leffingwell & Egan refused to do it on any other basis; that after talking with Judge Kinne for a time the latter said to the witness, "You make a note and let those gentlemen sign it and give them a draft for $2,000"; that the note was drawn up, and witness did not remember whether he, or Freeman, or the teller drew it; that it was signed by Free-

man and Holmes and handed to the teller, and a draft was given them. That the only bookkeeping conditions that required the taking of the note were, "that if we loan money we have to take a note for it." And that no paper, letter or any other writing whatever accompanied this original note.

The testimony of defendant Freeman is very voluminous, covering more than 100 pages of the printed record. By reason of much reiteration it has been difficult to state its substance concisely. Referring to the transactions at the bank on April 21st and April 26th, and after testifying that the making of the Detroit checks payable, one to him and one to Rhead, was a mistake, which he called Clarkson's attention to, and that they were finally indorsed and passed back to Clarkson, the witness saying: "Mr. Clarkson, give me a draft, you know these are going to Leffingwell & Egan," to which Clarkson replied, "Yes," the witness testified that a few minutes later Clarkson called him and said: "Say, I want to give you a draft for $18,000, Mr. Rhead has an arrangement, so he says, with Leffingwell & Egan for $2,000 more of his stock, so that I only want to give you a draft for $18,000"; that witness replied, "I don't know anything about that, this is the first I ever heard of it"; that Clarkson replied, "that is some arrangement Mr. Rhead has with Leffingwell & Egan"; to which witness replied:

"I don't believe it, it cannot be possible, after I have just received recent letters from Leffingwell & Egan that I am to send it back there as soon as possible, and you are a little late because you have been down east, and those letters say, 'we understand there are $20,000 to send.'"

Rhead was called up, and on being interrogated said: "Yes, I have that arrangement with Leffingwell & Egan." Clarkson repeated that the arrangement would go through all right, and Freeman reiterated

that it would not, and that he wanted a draft for $20,-000. Clarkson asked Rhead to indorse $2,000 of stock and give it to Freeman, and the latter reiterating that there was no use doing that, and that he wanted a draft for $20,000, Clarkson said to witness, "No, Freeman, I wish you would let this go this way. I want to collect this matter against Mr. Rhead." To which witness replied:

"I will be pleased to do anything for you, Mr. Clarkson, I cannot do this, it is not my money, I am carrying it out for the benefit of the company, and Mr. Holmes has indorsed $30,000 of paper, we all have, it is to go for the purpose as we understand it, now I want you to let this go."

Whereupon Mr. Clarkson handed out a draft payable to Leffingwell & Egan for $18,000 and the stock. Witness testified that he did not so consent, but that he took the draft under protest, as Clarkson had testified; that in reply to a telegram sent by witness, Leffingwell & Egan, on April 22d, telegraphed witness:

"Absolutely no agreement with Rhead in regard to this deal, *send* on the other $2,000 or there is nothing doing";

that as soon as he received that telegram witness showed same to Clarkson, when he reiterated his belief that it would "work out all right in a few days." On April 26, 1915, witness and defendant Holmes went to the bank and Holmes said to Clarkson, "We must have that $2,000"; the latter insisted that it should be put off. Holmes said:

"We have got to have it. Look what has happened. My name has gone with the others to the Detroit banks for $20,000, a draft for $18,000 has gone in, Freeman and Rhead have had their $5,000 each."

Finally Holmes said, "Freeman, come on, I want to go over and talk with Judge Kinne, the president of this bank." They accordingly went together to the

office of the judge, and had a talk with him. Witness said to the judge:

"We have been forming up that corporation, financing it, whereby we were raising $30,000 which was going over to Leffingwell & Egan, less an arrangement that had been made of $5,000 each to Rhead and me, and the other day when matters came together through Rhead claiming that he had an arrangement for $2,000 more, making $7,000 of his stock that was going to Leffingwell & Egan, whereby there would be only $18,-000 going to them. That $18,000 has gone and $2,000 of Rhead's stock has gone as well. Here are telegrams from Leffingwell & Egan saying there is no such arrangement. Your bank over there has $20,000 of our money, and we have got to have $2,000 to complete this arrangement because so much time has passed. The judge said, 'I cannot see any reason why, but what you are entitled to it, if it was raised for that purpose you tell me.' I said, 'Yes, certainly, the mortgage has been given to secure the different indorsers on that paper, and that $30,000 was raised for that special purpose, it has got to go so.' He said, 'I cannot see any reason why it should not.' I said, 'Will you come over to the bank now and talk this matter over with Mr. Clarkson?' He said, 'Yes,' and he put on his hat and we three then went over to the First National Bank  *  *  *  and we began to talk with Mr. Clarkson about this matter."

The conversation in the bank is then given, in the course of which the witness testified:

"Mr. Holmes said: 'It has got to come right now, if you don't pay this immediately and give us the $2,000 of our money, I will sue this bank before night.' Judge Kinne laughed and said, 'I would not blame you if you did, I guess you ought to.' Mr. Clarkson said, 'If I do it right away I shall have to charge off $2,000, for I have given up the paper of Mr. Rhead's and the security that went with it, I have given up $7,000 of his notes and his life insurance policy that was along with it.'"

After much more of repetition the witness testified:

"Mr. Clarkson said again, 'Give a note for a short time, it will come out all right,' having first said, 'Lay in a note for a short time, for you know, as a banker, that I shall have to charge this off, I have given up the note of Mr. Rhead and the security, I will not have anything on the books to represent what is given up.' Mr. Holmes said, 'I don't know about that, I appreciate you may have to charge it off, but I must have that money to send up to the bank.' * * * After a few minutes Mr. Holmes said, 'Mr. Clarkson, if this will accommodate you I will lay in my note here, but understand, I am only doing it to accommodate you and not be liable.'"

Whereupon the note was filled out and signed by the defendants, and handed to Clarkson and the draft was drawn and delivered.

Judge Kinne testified in rebuttal as follows:

"*Q.* It has been testified by Mr. Freeman that you accompanied him to the First National Bank with Mr. Holmes, and while there stated to Mr. Clarkson, the cashier of the bank, that he, Mr. Clarkson, should give them $2,000 in money from the bank because it belonged to them; did you ever make such a statement?

"*A.* I think not. I do not think I had any occasion to make such a statement as that. I do not think I had any such knowledge. I never stated that I authorized or instructed Mr. Clarkson to deliver this note on the theory that it was not an obligation that had to be paid.

"*Q.* State whether or not you ever made such a statement as that to either of these gentlemen?

"*A.* I never did."

The letters testified to by defendant Freeman as having been sent to the cashier of plaintiff upon the respective renewals are as follows:

"October 14, 1916.

"First National Bank,
    "City.
"*Dear Mr. Clarkson:*
    "I have had another conference with Mr. H. S. Holmes about the note of $2,000, dated April 26th,

1915, and taking the one up and giving another in its stead—the one attached for $2,120, dated April 26th, 1916.

"Mr. Holmes has now authorized me to deliver this last-mentioned note to you, but on the understanding, however, only under the relation existing when the first note was given which will control the situation—in this respect no change; and the fact that $120 is added, as manifestly the interest charge, shall in no way change or affect that relation.

"And Mr. Holmes also says that he can well see, on account of Federal banking department rulings and for your bank bookkeeping conditions, some such adjustment, for the time being, should be made, and he is pleased, after thinking it all over, to help out. I am,
"Very truly,
"A. F. FREEMAN."

"August 23, 1917.
"Mr. S. W. CLARKSON, Cashier, etc.,
"Ann Arbor, Michigan.
"*My dear Clarkson:*
"I saw Mr. Holmes here in Detroit today and I brought up the subject of signing the new note for $2,290, dated August 25, 1917.

"I had no little trouble in succeeding in getting him to again sign, for he always argues that your bank has the same amount of money in your hands belonging to him which would take care of this matter. However, I urged him strongly and finally he signed the note but only authorizes me to deliver it to you as the other one was as set forth in my letter to you of October 14th last, so under the same terms and understanding I am delivering this note to you herein signed by both of us. And we are doing this to accommodate the situation which we know arises in the banking department, and upon that understanding we are both pleased to help out and satisfy the department and your bank bookkeeping conditions. And I will be able to talk with you in some more detail when I reach home from Chicago, possibly not before next Monday. I am,
"Very truly,
"A. F. FREEMAN."

The foregoing testimony is here set out at considerable length to show that there were disputed questions of fact which were properly submitted to the jury. The plaintiff's requests to charge do not appear in the record. Defendants presented 19 requests to charge, nearly every one of which ended with an absolute direction of verdict for defendants. While refused as presented, many of them were modified and given, to be applied if the jury found the facts as claimed by defendants. The case was submitted to the jury, and they were, among other things, instructed as follows:

"2. If you find from the evidence in this case that the Michigan-Alberta Farming Company or those interested in the company authorized Freeman and Rhead to negotiate with the bank for the loan of $30,000 and that the Michigan-Alberta Farming Company allowed Freeman and Rhead to use its three promissory notes for the sum of $10,000 each indorsed by the interested parties, and that these notes were brought to the bank by Freeman and Rhead, or by one of them, and that the plaintiff bank dealt with Freeman and Rhead in regard to them, then so far as the bank was concerned, Freeman and Rhead had control of the notes and the bank was not obliged to look to any one else for authority to take the notes or deal with the proceeds. Freeman, Rhead and the bank being the principals involved in the transaction, could make any agreement they chose to make in regard to the notes or their proceeds. Therefore, if you find from the evidence in this case that when Freeman learned from Mr. Clarkson that Rhead claimed to have an agreement with Leffingwell & Egan to accept $7,000 of his stock in lieu of that amount in cash and that he first objected to such amount being retained by the bank for that purpose, and when he found that the bank would not go on with the transaction unless said $7,000 was retained and applied by the bank upon Rhead's debt to the bank, that he then consented to such application of said $7,000, then the plaintiff bank did have the right to retain the sum of $7,000 and apply it upon Rhead's debt in the bank.

"3. If you find from the evidence in this case that the plaintiff bank distributed the proceeds of the three $10,000 notes as it was directed to do by Freeman and Rhead, provided you further find from the evidence that the Michigan-Alberta Farming Company authorized Freeman and Rhead to negotiate the $30,000 loan upon its three $10,000 promissory notes, and allowed Freeman and Rhead to deal with the proceeds thereof in settling with Leffingwell & Egan for the land in question, then the plaintiff bank at the time it issued the $2,000 draft and took the first note signed by Freeman and Holmes, the plaintiff did not have $2,000 in its hands belonging to the defendants or to the Michigan-Alberta Farming Company, and the plaintiff will be entitled to recover in this action the sum of $2,290 and interest thereon from the 25th day of August, 1917, to this date, interest to be computed at the rate of 6 per cent. per annum."

Error is assigned upon this part of the charge. There was a motion for a new trial, presenting substantially the same questions as are presented in the assignments of error. The motion was denied, and exceptions duly taken.

In this court, one of the principal propositions urged by appellants is that the note in suit was delivered for a specified purpose only and was never to be enforced. The note was absolute in form. It is a general rule of law that parol evidence is inadmissible to vary or contradict a contemporaneous written contract. If a note be absolute upon its face, no evidence of a verbal agreement, made at the same time, qualifying its terms, can be admitted. *Phelps* v. *Abbott*, 114 Mich. 88, 91.

In both of the letters above set forth reference is made to the "understanding" when the first note was given, "which will control the situation." It is not claimed that either of the renewal notes changed the original situation. The pertinent question then is, What were the circumstances under which the first note was given? These may be inquired into as bear-

ing upon the consideration for that note. *Lovell* v. *Willard,* 28 Mich. 346; *Macomb* v. *Wilkinson,* 83 Mich. 486; *Kulenkamp* v. *Groff,* 71 Mich. 675 (1 L. R. A. 594); *Kelley* v. *Guy,* 116 Mich. 43; *Graham* v. *Alexander,* 123 Mich. 168; *Nowack* v. *Lehmann,* 139 Mich. 474. The evidence being in conflict there was here a question of fact for the jury.

It is also urged by appellants that the full legal title to the $20,000 fund raised was in defendant Holmes, and the equitable title was in the Farming Company. We think that is not the precise question involved. Defendant Freeman was the president of the company. There was evidence that he and Rhead had been given authority by the principal to negotiate the notes.

There is authority to the effect that in the absence of knowledge of any limitation upon the authority apparently conferred by the principal, a bank may rely upon such apparent authority. 3 R. C. L. p. 609; *Merchants, etc., Nat. Bank* v. *Furniture Co.,* 70 L. R. A. 312 (57 W. Va. 625, 50 S. E. 880).

The apparent authority of an agent to act as the representative of his principal is to be gathered from all the facts and circumstances in evidence, and, ordinarily, this is a question of fact for the jury's determination. 21 R. C. L. p. 854 *et seq.; Austrian & Co.* v. *Springer,* 94 Mich. 343, and cases cited. It was probably in view of these principles that the court charged the jury as above stated.

It is further claimed by appellants that there was no consideration for the note in suit; that no loan was made nor benefit given to defendants, and that they secured no fund which that note represents. To use a common expression this "begs" the principal question in the case. If the testimony on behalf of the plaintiff is true, a loan of $2,000 was made to the defendants, and they obtained that amount of money when

they gave the note. There was undoubtedly some dispute between the cashier and defendant Freeman, but if there was a *bona fide* settlement of the matter in dispute that would furnish a valid consideration for the note.

Before bringing the instant suit the plaintiff filed a bill in chancery against Rhead to compel him to deliver to the bank a note for $2,000 and an insurance policy, as security, to take the place of the notes and securities surrendered to him. Upon the hearing the . bill was dismissed. Defendants contend that by such conduct the plaintiff is estopped from maintaining the instant case. The elements of an estoppel are not present here. The claimed inconsistent conduct of plaintiff, and its cashier, was for the consideration of the jury.

Was matter prejudicial to appellants admitted in evidence? While counsel do not refer to any assignment of error, they do complain that the court allowed "counsel to journey with the jury over the 'Canadian Northwest' and enlarged upon that for 'all they were worth.'" It is difficult to answer such an assertion. We infer that counsel mean to complain that in the cross-examination of defendants they were required to state what finally became of the lands upon foreclosure of the mortgage—that defendants were still interested in them, etc. The mortgage and declaration of trust had been offered in evidence by defendants. While the evidence complained of was remote, we cannot say that the admission of this testimony was prejudicial, or that it resulted in a miscarriage of justice. (See section 14565, 3 Comp. Laws 1915.)

By an assignment of error it is claimed that the court erred in denying the motion for a new trial. In that motion it was stated that the verdict was against the clear weight of the evidence and against the charge of the court. We do not agree with either

contention, and it is unnecessary to refer to our numerous decisions stating the rules that control such questions. We think that the weight and sufficiency of the evidence were peculiarly questions for the jury, and warranted the verdict rendered. We have spent much time in the examination of this record, and have examined and carefully considered every assignment of error. In our opinion the errors assigned are not well taken. We think the case was, fairly tried and properly submitted to the jury, and finding no reversible error in the record, the judgment below is affirmed.

STEERE, C. J., and MOORE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.

The late Justice BROOKE took no part in this decision.